NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ANASTASIA FIELD,**

          **Plaintiff,**

**v.**                                   **Case No. 6:18-cv-119-Orl-37KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

          **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Plaintiff, Anastasia Field, seeking review of the final decision of the Commissioner of Social Security denying the claim for social security benefits filed by her deceased son, Christopher Field, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 7, 9, and the parties' Joint Memorandum, Doc. No. 23.[1] The record also contains supplemental memoranda filed by the parties on the issue of Anastasia Field's standing. Doc. Nos. 28, 29.[2]

---

[1] In the Scheduling Order, I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record. Doc. No. 10. Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Scheduling Order. *Id.* at 4.

[2] Because the record refers to several Field family members, I will often refer to claimant Christopher Field as Christopher and Plaintiff Anastasia Field as Anastasia for ease of reference. I will refer to other Field family members by their full names.

## PROCEDURAL HISTORY.

In May 2013, Christopher Field filed applications for disabled adult child benefits[3] under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.*, and for benefits under the Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.*  He alleged that he became disabled on October 1, 2011, when he was 19 years old.  R. 429, 431.

After his applications were denied originally and on reconsideration, a request was made for a hearing before an Administrative Law Judge ("ALJ").  R. 259-61.  A hearing was held on September 15, 2015 at which Christopher, accompanied by an attorney, and a vocational expert ("VE") appeared, but the hearing was continued because counsel for Christopher did not timely submit the medical records and other documents.  R. 157-68.

Christopher Field died on November 30, 2015, before another hearing before the ALJ was scheduled.  R. 461.  The Certification of Death reflects that he was never married and that Anastasia Field is his mother.  *Id.*  Anastasia Field substituted as the representative of the claimant in the administrative proceedings after Christopher's death.  *See* R. 56, 418.

The ALJ held additional hearings on April 12, August 31 and November 10, 2016.  R. 54-154.  Anastasia testified at the April 12 and August 31 hearings, and Kweli Amusa, M.D., a medical expert ("ME"), also testified at the August 31 hearing.  R. 72-117, 119-53.  A VE testified at the November 10 hearing.  R. 54-70.

---

[3] An adult who was disabled before age 22 may be eligible for disabled adult child benefits if his parent is deceased or receives retirement or disability benefits.  "Such benefits are paid based on the parent's Social Security earnings record."  *Fabian v. Berryhill*, 734 F. App'x 239, 241 n.2 (5th Cir. 2018) (citing 20 C.F.R. § 404.350(a)).

After considering the testimony and the evidence in the record, the ALJ issued a Decision on February 2, 2017. R. 16-42. The ALJ concluded that Christopher was born on April 25, 1992 and that he had not attained age 22 as of October 1, 2011, the alleged disability onset date. He found that Christopher had not engaged in substantial gainful activity after the alleged disability onset date. R. 20.

The ALJ determined that Christopher had the following severe impairments: a history of recurrent endocarditis secondary to intravenous ("IV") drug abuse and polysubstance drug abuse; a history of mitral valve replacement secondary to endocarditis; a history of a seizure disorder likely secondary to opiate withdrawal or IV drug abuse; and a history of polysubstance abuse. *Id.* The ALJ concluded that Christopher did not have a severe mental impairment and that Christopher did not have an impairment or combination of impairments that met or equaled an impairment listed in the SSA regulations. R. 20-21.

The ALJ concluded that Christopher had the residual functional capacity ("RFC") to perform a range of light work, as follows:

> The claimant could, during a normal 8-hour workday with reasonable and customary breaks, sit, stand and walk for 6 hours each; he could occasionally lift/carry 20 pounds and more frequently lift/carry 10 pounds or less; he could use his upper or lower extremities for the push/pull operation of arm/hand and foot/pedal controls occasionally; he could climb ramps and stairs occasionally, but could never climb ropes, ladders and scaffolds; all other postural activities could have been performed occasionally; he could use his upper extremities for reaching in all directions, handling, fingering and feeling frequently; he had no difficulties in his ability to see, speak or hear; he should avoid work around unprotected heights and dangerous moving machinery; he was able to perform simple, rote and repetitive tasks in a well-structured work setting where job tasks were relatively the same from one day to the next; he could have only occasional interaction with members of the general public, co-workers and supervisors; and was unable to perform jobs requiring that he meet a strict production goal or quota; but he could not sustain this work activity on a regular and continuing basis (8 hours per day, 5 days per week or

>  an equivalent work schedule pursuant to SSR 96-8p) due to his continued IV drug and other substance abuse.

R. 23.

The ALJ found that Christopher did not have any past relevant work. R. 36. After considering testimony of the VE, the ALJ found that considering Christopher's substance abuse disorders, there were no jobs available in the national economy that Christopher could have performed. *Id.*

However, the ALJ found that if Christopher stopped the substance abuse, he would continue to have a severe impairment or combination of impairments, but none that met or equaled an impairment listed in the SSA regulations. R. 37-38. The ALJ found that, after stopping substance abuse, Christopher would have the RFC to perform a range of light work as follows:

> The claimant could, during a normal 8-hour workday with reasonable and customary breaks, sit, stand and walk for 6 hours each; he could occasionally lift/carry 20 pounds and more frequently lift/carry 10 pounds or less; he could use his upper or lower extremities for the push/pull operation of arm/hand and foot/pedal controls occasionally; he could climb ramps and stairs occasionally, but could never climb ropes, ladders and scaffolds; all other postural activities could have been performed occasionally; he could use his upper extremities for reaching in all directions, handling, fingering and feeling frequently; he had no difficulties in his ability to see, speak or hear; he should avoid work around unprotected heights and dangerous moving machinery; he was able to perform simple, rote and repetitive tasks in a well-structured work setting where job tasks were relatively the same from one day to the next; could have only occasional interaction with members of' the general public, co-workers and supervisors and was unable to perform jobs requiring that he meet a strict production goals or quotas. These limitations were secondary to his lack of any past relevant work as opposed to any mental impairments.

R. 38. After considering the testimony of the VE, the ALJ concluded that with this post-substance-abuse RFC, Christopher could have performed jobs available in the national economy, including the light, unskilled jobs of blade balancer, egg candler and marker II. R. 41. Therefore, the ALJ

concluded that Christopher was not under a disability from October 1, 2011 through the date of his death. *Id.*

Anastasia requested that the Appeals Council review the ALJ's decision. R. 419. She submitted her own medical records and medical records of Christopher's sister, Tabitha Field. R. 1409-31.[4] On November 20, 2017, the Appeals Council notified Anastasia that the new evidence was not material to Christopher's claim for disability and, therefore, it was not considered. R. 2. The Appeals Council found no reason to review the ALJ's decision. R. 1.[5]

Anastasia now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION.

"Judicial review is limited to actual cases and controversies brought by litigants who demonstrate standing." *See, e.g.*, *Howard o/b/o Whitelaw v. Berryhill*, No. 18-C-491, 2018 WL 3978126, at *2 (E.D. Wis. Aug. 20, 2018) (citing *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 886 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 740 (2018)). "The plaintiff bears the burden of establishing the elements of standing." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Being a named party to a case is not enough to give a party standing. Rather, in the context of social security disability cases, the Plaintiff must demonstrate that she is an individual who is entitled to receive any benefits due to the claimant. *See, e.g.*, *Brown o/b/o Brown v. Berryhill,* No. 17-CV-11577, 2017 WL 5898459, at *2 (E.D. Mich. Nov. 30, 2017). An issue

---

[4] The record reflects that the Appeals Council did not include one document in the record because it did not refer to Christopher. R. 1408.

[5] Anastasia's attorney also submitted a letter arguing that the ALJ exhibited bias. R. 424-25. The Appeals Council considered that complaint and found that it was not supported by the record. R. 2.

exists as to whether Anastasia is an individual who is entitled to receive any benefits found to be due to Christopher.

Social Security regulations establish how underpaid benefits are distributed in the event of the claimant's death. With respect to Christopher's SSI claim, benefits that are allegedly due to him may be distributed only to his surviving spouse and not to his estate. 20 C.F.R. § 416.542(b)(1)-(4). Therefore, Anastasia is not an eligible recipient for any SSI benefits arguably due to Christopher. *See Knight v. Colvin*, No. 3:14-cv-1438-J-JBT, 2015 WL 12852312, at *2 (M.D. Fla. Dec. 11, 2015) (citations omitted) (stating that "[i]t is clear that a parent of a deceased adult disabled child is not entitled to collect past due SSI benefits owed to the child"). Accordingly, because Anastasia does not have standing to pursue Christopher's SSI claim, I **RECOMMEND** that the Court find that her appeal from the denial of Christopher's SSI claim is due to be **DISMISSED.**

With respect to Christopher's disabled adult child claim under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.*, benefits allegedly due to him would be distributed to a living person in the highest order of priority listed in 42 U.S.C. § 404(d), as implemented by 20 C.F.R. § 404.503. The order is as follows: (1) the claimant's surviving spouse who was living in the same household with the decedent at the time of his death or who is entitled to a monthly benefit on the basis of the same earnings record as the decedent; (2) the claimant's children who were entitled to a monthly benefit based on the same earnings record as the decedent; (3) the claimant's parent(s) entitled to a monthly benefit on the basis of the same earnings record as was the deceased individual for the month in which such individual died; (4) a surviving spouse who does not meet the requirements of category one; (5) a

6

surviving child who does not meet the requirements of category two; (6) a surviving parent who does not meet the requirements of category three; and (7) the legal representative of the claimant's estate. 42 U.S.C. § 404(d); 20 C.F.R. § 404.503(b). "The courts which have specifically addressed the issue note that an eligible individual is only entitled to a deceased's benefits if there are no other preceding individuals in the line of priority . . . [and] hold that persons lower on the priority list lack standing to seek review of a benefit denial." *Howard o/b/o Whitelaw*, 2018 WL 3978126, at *3 (quotation marks omitted) (collecting cases).

Because Christopher was not married and it appears that he had no children (R. 429-30, 609, 612, 759), the person with the highest priority is the parent who would be entitled to a monthly benefit based on the same earnings record on which Christopher relied in his disabled adult child application. *See* 42 U.S.C. § 404(d)(3). Christopher based his disabled adult child application on the earnings record of his father, Michael Larkin Field. R. 499. Anastasia has presented a death certificate showing that Michael Larkin Field died on August 19, 2018. Doc. No. 31-1. The person with the next highest level of priority is Christopher's other surviving parent, Anastasia. Therefore, I **RECOMMEND** that the Court find that Anastasia has standing to seek review of the final decision of the Commissioner denying Christopher's application for OASDI disabled adult child benefits.

Anastasia has exhausted the administrative remedies on behalf of Christopher as to his disabled adult child claim. Therefore, the Court has jurisdiction to review the decision of the Commissioner on that claim pursuant to 42 U.S.C. § 405(g).

NOT FOR PUBLICATION

**STANDARD OF REVIEW**.

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

**SUMMARY OF THE FACTS.**

After a thorough review of the record, and after considering the Commissioner's objections to some of the facts set forth in the Joint Memorandum, I find that the facts are generally adequately stated in the ALJ's decision and the Joint Memorandum, which statement of facts I incorporate by reference. Accordingly, I will only summarize facts pertinent to the issues raised.

*Background and Reported Functional Impairments*.

Christopher was born on April 25, 1992. R. 429. He had at least the equivalent of a high school education.[6] He had limited prior employment and no past relevant work. *See, e.g.*, R. 503, 572.

Written disability reports reflect that Christopher had been diagnosed with congenital valve defect, series of strokes; Attention Deficit Hyperactivity Disorder; Bipolar Disorder; bulging discs; a seizure disorder; and arthritis. R. 502. In one report, Christopher indicated that he suffered pain in his back, neck, shoulders and legs. He could not sit or stand for too long, and he had pain with

---

[6] The record is inconsistent on whether Christopher finished high school or whether he obtained a GED. *See* R. 503 (stating he completed twelfth grade in 2010); R. 519 (stating that he did well on the GED); R. 609 (stating that he dropped out of high school in tenth grade); R. 759 (stating that he completed high school); R. 878 (stating that he had his GED).

8

walking and bending. R. 512. He also had difficulty lifting, bending, squatting and pushing. R. 512, 514. He became fatigued easily and experienced shortness of breath. R. 513-14.

In another written report, Anastasia stated that Christopher had no feeling in his right arm or hand, and limited strength in his right, dominant hand. R. 518. She estimated that he could lift about 1 pound with his right hand. R. 523. He could not write legibly. Christopher also had slurred speech. Additionally, he had difficulty concentrating for more than 15 to 20 minutes, and he had trouble sleeping. R. 518-19, 523. He feared crowds. R. 524. Anastasia also wrote that Christopher was able to dress himself, but he sometimes needed to be reminded to bathe, change his clothes, care for his hair and shave. He also needed to be reminded to take his medication. R. 519. He could prepare simple food and do household chores over a period of time. R. 520. He could do limited shopping. R. 521. He spent his days watching television, playing cards, using a computer and playing video games. R. 522.

Another unsigned, typewritten report states that Christopher's condition continued to worsen. His left arm was paralyzed, and he had more intense pain throughout his body. He had been told that his mental condition seemed to be deteriorating. He was less able to care for his daily needs and his sleep was more limited. R. 538, 540. He had difficulty finding doctors he could afford. R. 541.

*Medical Record Summary.*

The medical records before the alleged disability onset date reflect that Christopher had been diagnosed with boutonniere deformities of all fingers on both hands. R. 1399. In 2006, Raymond J. Fernandez, M.D., also noted mild weakness of ankle dorsiflexion, R. 1398, but subsequent tests showed no neuropathy, R. 1401.

NOT FOR PUBLICATION

On February 27, 2008, Christopher was involuntarily hospitalized by a law enforcement officer who stated that Christopher had thoughts of self-harm. On admission, Christopher denied being suicidal. Leo G. Salter, Ph.D., observed that Christopher's speech was clear and relevant. His memory and concentration were good. He did well on mental tests. He did not have a depressed mood. His judgment and insight were good but impaired when he was intoxicated. R. 609. The diagnostic impressions included substance abuse and a personality disorder with psychopathic traits. He was referred to outpatient treatment. R. 610.

On March 18, 2011, Barbara Carter, LMHC, performed an outpatient therapy assessment. Christopher stated that he had a circle of drug-using friends and that he could easily obtain drugs from a number of sources. He last used cocaine on March 14, 2011. R. 611-14.

Christopher was hospitalized on December 18, 2011 after experiencing a seizure in an emergency room. The medical record reflects that Christopher had an extensive history of IV drug abuse and methicillin-resistant Staph aureus sepsis and bacteremias ("MRSA"). He also had a history of head trauma secondary to motor vehicle accidents. Christopher reported that "he was injecting himself with intravenous Dilaudid approximately 2 to 3 days ago." The treatment provider noted evidence of track marks in Christopher's right forearm and right arm. R. 726.

On January 20, 2012, Christopher underwent mitral valve replacement surgery. R. 741. The discharge report indicated that Christopher's diagnoses were resolved sepsis, resolved endocarditis, controlled seizure disorder, status-post mitral valve replacement and IV drug abuse. R. 729.

Christopher was hospitalized again in January 2013 due to seizures. Mandeep Garewal, M.D., indicated that this was a possible breakthrough seizure rather than a seizure associated with withdrawal from opiates or noncompliance with medication. R. 636-37.

On July 1, 2013, J. Jeff Oatley, Ph.D., examined Christopher at the request of the Office of Disability Determinations. Christopher reported that he suffered from seizures and that his right arm had been numb for 3 or 4 months. He complained of racing thoughts, occasional anger, life-long depression and suicidal ideation. Dr. Oatley noted that he had previously seen Christopher in 2012, and that records from Stewart-Marchman-Act Behavioral Healthcare showed positive test results for benzodiazepines, methadone, oxycodone, cocaine and marijuana. At that time, Dr. Oatley diagnosed Christopher with malingering, polysubstance dependence and an antisocial personality disorder. R. 758-59. Upon examination, Dr. Oatley noted that Christopher's speech was coherent and he was easy to understand. He signed his name in cursive with his right hand using a good grip. After administering some psychological tests, Dr. Oatley opined that Christopher had a mild concentration deficit and that he was a slow cognitive processor. R. 759-60. Dr. Oatley's diagnoses included polysubstance dependence per medical records, malingering, an antisocial personality disorder and a cognitive disorder. Christopher's prognosis was guarded. R. 760.

In November 2014, Christopher was hospitalized due to a drug overdose. R. 1119. A drug urine screen was positive for opiates. He admitted using IV drugs with Dilaudid with his last use one week earlier. R. 1156-60. Upon discharge on January 12, 2015, Christopher agreed to stop using IV drugs. R. 1155.

NOT FOR PUBLICATION

Christopher was hospitalized again in June 2015, due to a bloody stool and dizziness upon standing. R. 1331. He stated that morphine did not relieve pain in his back. R. 1336. Ryan R. Rees, M.D., diagnosed malingering. *Id.*

On November 16, 2015, Halifax Health Hospice issued a letter stating that Christopher had been diagnosed with sepsis and septic shock, endocarditis and chronic kidney disease. R. 819. Christopher died on November 30, 2015. His death certificate reflects the cause of death as complications from endocarditis and IV drug use. R. 461.

*ME Testimony*.

Dr. Amusa, the ME, is board-certified in internal medicine. R. 74. Based on her review of the record, Dr. Amusa testified that Christopher suffered from a number of complications due to IV drug use primarily in his cardiovascular system. Dr. Amusa explained that with IV drug use, bacteria can infect the valves of the heart and blood vessels leading to the heart. Christopher had a diagnosis of endocarditis, which is a type of infection. Christopher also mitral heart valve disease; this valve was replaced in January 2012. Christopher admitted that he had been using oxycodone intravenously. R. 80. Dr. Amusa opined that Christopher's recurrent infections/endocarditis were a direct result of his IV drug abuse. R. 82. Dr. Amusa further opined that if Christopher had ceased his substance abuse, his underlying infection would have had a better chance of resolving without further damage to his heart. R. 83.

In response to questions from counsel for Anastasia, Dr. Amusa testified that she was familiar with Ehlers-Danlos Syndrome ("EDS").[7] She explained that this is a genetic disorder that

---

[7] "The Ehlers-Danlos syndromes are classified as connective tissue disorders which involve hypermobility, skin extensibility, and tissue fragility. . . . Other common features of EDS syndromes are soft, translucent, hyperextensible skin, cardiac abnormalities such as mitral valve prolapse, and prominent

12

may result in some laxity in joints and some heart conditions due to a connective tissue disorder. R. 94-96. Dr. Amusa could not render an opinion regarding whether Christopher had EDS based on medical records showing that Christopher's sister had been diagnosed with EDS. R. 96-97. In response to a question from the ALJ, Dr. Amusa testified that she did not find any evidence in the record of Christopher having a genetic disorder. R. 98.[8]

In November 2016, Tabitha Field was examined at the Mayo Clinic based on a history of joint pain and gastrointestinal problems. R. 1414. Peter T. Dorsher, M.D., stated that Tabitha Field met the diagnostic criteria for EDS, and that she also had fibromyalgia and abnormal processing of medication metabolically. R. 1420-21.

*Opinions of the VE.*

After the second hearing, the ALJ served written interrogatories on the VE. R. 56. The ALJ asked the VE to assume a hypothetical person who had the RFC applicable to Christopher if he stopped substance abuse. R. 572. The VE responded that this person could perform the jobs of blade balancer, egg candler and marker II, which were light unskilled jobs that existed in the national economy. R. 573. Counsel for Anastasia was permitted to examine the VE at the last hearing before the ALJ. R. 58-68.

---

vasculature of the skin. In severe cases of EDS syndromes, aneurysms and sudden death have been reported." R. 1414 (Mayo Clinic record). EDS is an inherited condition. Individuals who are affected have a gene change, and affected individuals have a 50% chance of passing the gene change to each of their children. R. 1415.

[8] At the third ALJ hearing, counsel for Anastasia told the ALJ that he had recently submitted evidence from the Mayo Clinic showing that Anastasia and Tabitha Field, Anastasia's daughter, had EDS. The ALJ said that the information was not in the file and that it was untimely. R. 57.

NOT FOR PUBLICATION

# ANALYSIS.

In the Joint Memorandum (Doc. No. 23), which I have reviewed, counsel for Anastasia asserts three interrelated assignments of error. In essence, he contends that if he had been allowed to fully develop the record regarding the possibility that Christopher had EDS, the evidence would have established that Christopher's medical impairments arose from that condition and not from IV drug abuse. It appears that counsel contends that Christopher was disabled due to EDS. He asks that the Court reverse the final decision of the Commissioner and remand the case with a direction to award benefits. These are the only issues I will address.

*Failure to Allow Counsel to Develop the Record.*

In the first two assignments of error, counsel for Anastasia argues that both the ALJ and the Appeals Council improperly limited his ability to present evidence to support his theory that EDS, rather than IV drug abuse, resulted in Christopher being disabled. Specifically, he complains that the ALJ interrupted his cross-examination of Dr. Amusa about whether Christopher's heart and gastrointestinal problems were evidence that he had EDS. The pertinent portion of counsel for Anastasia's questioning of Dr. Amusa is as follows:

> Q If they were provided Oxycontin in pill form but they had this genetic disease, Ehlers-Danlos Syndrome, and would the injected form work when the ingested form would not?
>
> A [Dr. Amusa] I am unable to say that. . . .
>
> Q Okay. Let's see. If someone had this genetic disease, Cytochrome 450, Ehlers-Danlos Syndrome, could that have an effect on having their heart fail so that they would need this replacement?
>
> A So, again, those individuals may develop heart disease just due to the connective tissue disorder that results from this genetic condition. So, it is -- it has been demonstrated and it is known that they can develop problems with the heart valves or with their heart in general.

14

Q Okay. If this person -- because this person was poor so this person did not get any sort of testing for this condition so we cannot reliably say he must have this condition. But if his sister went to the Mayo Clinic and was diagnosed with this and if his mother is now experiencing syndrome and is set to go to the Mayo Clinic shortly because of similar symptoms, would it be possible or even probable that he might have this disease?

A It would be – it's a genetic disorder. Again, it would be impossible for me to say.

ALJ: Yeah, there's no evidence that he was diagnosed with this disorder during the course of his lifetime. So, yeah, a lot of ifs and this sort of thing, but we have to go on what's in the record, Counsel.

ATTY: Right.

ALJ: Not what if. . . . I mean, we're basing this on objective findings that are in the record and none of the physicians that treated him came up with this as a diagnosis. Now, that may not -- that may be unfortunate, but when they discovered that he was obviously -- had some kind of substance abuse issue, they naturally probably gravitated toward the fact well his underlying problems were likely caused by the substance addiction rather than some other cause. Now, that may or may not be a proper conclusion, but that's what they drew. So, we don't have any evidence during the time that he was living of a genetic disorder. So, try to move on to something else that reflects what's in the record

ATTY: Well, that is true. We have evidence now.

ALJ: No, that's not good enough. Now, during the time period in question, that's all I'm interested in, during the time period in question from the alleged onset date through November 30, 2015. Try to stick with the record.

ATTY: Okay. . . . I would like to target this as an appealable issue though.

ALJ: You can do . . . whatever you want, but I mean I'm just saying that's not reflected in this record and it's not part of Dr. Amusa's testimony. Did you find any evidence of a genetic disorder that was defined in this record or discussed or otherwise felt to be a consideration in this particular young man's medical history or problems, Dr. Amusa?

ME [Dr. Amusa]: No, sir, I did not.

ALJ: All right. . . . Anything else?

NOT FOR PUBLICATION

ATTY: No.

R. 96-98.

Counsel for Anastasia did not cite any legal authority to support the argument that the ALJ improperly limited his cross-examination of the ME. Doc. No. 23, at 13-19. I will assume, for purposes of this discussion, that counsel intends to raise a due process argument regarding the limitation on cross-examination.

"[T]here must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [Commissioner] for further development of the record. The court should be guided by whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.'" *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997) (citing *Brown v. Shalala,* 44 F.3d 931, 934-35 (11th Cir. 1995)).

Counsel for Anastasia cannot establish prejudice because he has not cited to any evidence that a medical professional opined that Christopher suffered from EDS. To the contrary, Dr. Amusa testified that she could not determine whether Christopher had EDS based on a determination that Tabitha Field had EDS. Additionally, Dr. Amusa testified that she found no evidence in the record that Christopher suffered from this genetic disorder. There are, therefore, no evidentiary gaps that would have been filled if the ALJ had permitted counsel for Anastasia to continue to question Dr. Amusa about the hypothetical possibility that Christopher had EDS.

Counsel for Anastasia also argues that the Appeals Council erred by excluding one record that did not discuss Christopher and by finding that the Mayo Clinic records regarding Tabitha Field

16

NOT FOR PUBLICATION

and Anastasia were not material because they were not relevant to Christopher's claim.[9] New evidence is only material if it raises a reasonable possibility that it would change the administrative result. *See Robinson v. Astrue*, 365 F. App'x 993, 996 (11th Cir. 2010) (unpublished opinion cited as persuasive authority). Because there is no opinion from a medical professional that these records support a finding that Christopher had EDS, there is not a reasonable possibility that consideration of those records would have changed the ALJ's Decision.

For these reasons, I recommend that the Court find that the first two assignments of error are not well taken.

*Compliance with SSR 13-2P.*

In the third assignment of error, counsel for Anastasia argues that the ALJ failed to follow SSR 13-2P, which addresses how to evaluate cases involving drug addiction and alcoholism. SSR 13-2P, 2013 WL 621536 (S.S.A. Feb. 20, 2013). Initially, he argues that the ALJ erred by using the terms "dependence" and "addiction" interchangeably. However, SSR 13-2P states that for purposes of that ruling "there is no substantive difference between the two terms." *Id.* at *3 n.3.

Counsel for Anastasia also argues that the ALJ erred by identifying Christopher's drug abuse as polysubstance dependence because that diagnosis is no longer recognized in the DSM-V. I note that the ALJ found that Christopher had a history of polysubstance drug abuse. R. 20. The ALJ used the term "polysubstance dependence" when referring to Dr. Oatley's findings. R. 21. This is the term Dr. Oatley used in his report. R. 760. This argument is, therefore, unavailing.

---

[9] For purposes of this review, the Court considers the evidence presented to the Appeals Council as part of the record as a whole. *See Keeton v. Dept. of Health & Human Servs.*, 21 F.3d 1064, 1067 (11th Cir. 1994) ("[N]ew evidence first submitted to the Appeals Council is part of the administrative record that goes to the district court for review when the Appeals Council accepts the case for review as well as when the Council denies review.").

NOT FOR PUBLICATION

Additionally, counsel for Anastasia argues that the ALJ erred by failing to consider that IV drug use may have been the only effective way for Christopher to absorb his pain medication when he was not in the hospital. He cites no evidence in the record to support that conclusion. Rather, in one instance in which Christopher complained that prescription pain medication was ineffective, the treatment professional determined that Christopher was malingering. R. 1336.

Finally, counsel for Anastasia makes the conclusory statement that "[t]he ALJ did not take into account that the cessation of taking drugs did not eliminate the Claimant's disabling conditions." Doc. No. 23, at 21. As counsel for the Commissioner correctly argues, it is unclear what facts and law counsel for Anastasia relies on to support this argument. *Id.* at 22-23. Dr. Amusa testified that Christopher's IV drug use contributed to heart infections that ultimately led to his death. This testimony is supported by Christopher's death certificate, which lists complications from endocarditis and IV drug use as the cause of his death.

Moreover, as he was required to do by law, the ALJ expressly considered whether Christopher would have been disabled if he stopped abusing drugs. The ALJ concluded that, in that circumstance, Christopher would not have been disabled. Therefore, the ALJ properly considered whether cessation of taking drugs would eliminate Christopher's alleged disability and found that Christopher would not be disabled if his drug abuse ceased.

For all of these reasons, I recommend that the Court find that the third assignment of error is not meritorious.

### RECOMMENDATIONS.

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that Plaintiff's appeal from the denial of SSI benefits be **DISMISSED.** I further **RECOMMEND** the final decision of


NOT FOR PUBLICATION

the Commissioner denying the OASDI disabled adult child claim be **AFFIRMED**. Finally, I **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

### Notice.

Failure to file written objections to the proposed findings and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its filing shall bar an aggrieved party from challenging on appeal the district court's order based on unobjected-to factual and legal conclusions.

**Respectfully Recommended** this 10th day of December 2018.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE